IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| SEACOAST BANKING CORPORATION OF FLORIDA, and SEACOAST NATIONAL BANK | ) ) ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiffs, | ) ) | NO. |
| v. | ) ) | |
| MATTHEW DIEMER, JOSEPH DESOUSA, JOHN CASEBIER, BRIAN WICKMAN, and GARRY LITTLER, as individuals, and ONE FLORIDA BANK, a Florida Corporation, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

The individual defendants in this action are former employees of Seacoast Bank who resigned *en masse* on December 26th, without notice, and immediately went to work at a new competitor bank in Orlando. Just prior to their orchestrated resignation and departure, at least four of the five individual defendants—and several of their Seacoast subordinates who joined in the mass resignation—spent time accessing the confidential banking information of hundreds of Seacoast customers. They did this without permission, at times during the evening after the workday had ended, and for the specific purpose of stealing that information to use it in competition against Seacoast. This lawsuit is filed to protect the private banking information of Seacoast customers, and to obtain relief from the individual defendants and One Florida Bank for their unlawful and tortious conspiratorial behavior, and in particular their theft and abuse of Seacoast customers' private banking information.

Accordingly, for the conduct alleged herein, Plaintiff Seacoast Banking Corporation of Florida ("Company"), and its wholly owned banking subsidiary Seacoast National Bank ("Bank") (together with the Company, "Seacoast"), hereby seeks injunctive relief and damages against:

(1) Defendants Matthew Diemer ("Diemer"), Joseph DeSousa ("DeSousa"), John Casebier ("Casebier"), Brian Wickman ("Wickman") and Garry Littler ("Littler") (collectively, the "Individual Defendants"), for breach of the duty of loyalty that they owed to Seacoast during their employment;

(2) Diemer, DeSousa, Casebier and Wickman for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001 *et seq.*, and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and against Defendant One Florida Bank as vicariously liable for the Individual Defendants' misappropriation;

(3) Diemer, for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g); and

(4) One Florida Bank, for conspiring with the Individual Defendants to engage in the above-described wrongful and unlawful activities.

In support of its claims, Seacoast states as follows:

## PARTIES

1.      Plaintiff Seacoast Banking Corporation of Florida is a financial holding company, incorporated in Florida in 1983, and registered under the Bank Holding Company Act of 1956, as amended. The Company's principal subsidiary is Seacoast National Bank, a national banking association. The Bank commenced its operations in 1933. The Bank is a community bank that provides personal, business and commercial banking services to clients. Although the majority of Seacoast's customers are located in Florida, Seacoast also engages

in interstate commerce. Seacoast maintains its principal place of business at 815 Colorado Avenue in Stuart, Florida.

2.      Defendant Diemer is an individual over eighteen (18) years of age, who at all times relevant to this action resided and/or maintained a residence in Sanford, Florida, and was employed by Seacoast as a Senior Vice President ("SVP"), Commercial Banking Director for the Orlando area until he resigned on December 26, 2019.

3.      Defendant DeSousa is an individual over eighteen (18) years of age, who at all times relevant to this action resided and/or maintained a residence in Debary, Florida, and was employed by Seacoast as an SVP, Commercial Banking Manager for the Orlando area until he resigned on December 26, 2019.

4.      Defendant Casebier is an individual over eighteen (18) years of age, who at all times relevant to this action resided and/or maintained a residence in Winter Park, Florida, and was employed by Seacoast as an SVP, Commercial Banking Manager for the Orlando area until he resigned on December 26, 2019.

5.      Defendant Wickman is an individual over eighteen (18) years of age, who at all times relevant to this action resided and/or maintained a residence in Sanford, Florida, and was employed by Seacoast as an SVP, Commercial Banking Manager for the Orlando area until he resigned on December 26, 2019.

6.      Defendant Littler is an individual over eighteen (18) years of age, who at all times relevant to this action resided and/or maintained a residence in DeLand, Florida, and was employed by Seacoast as an Associate Vice President, Commercial Banking Coordinator Supervisor in the Orlando area until he resigned on December 26, 2019.

7.     Defendant One Florida Bank is a direct competitor of Seacoast in the personal, business and commercial banking market in Florida, particularly in the Orlando area. On information and belief, One Florida Bank is a corporation organized under the laws of the State of Florida, with its principal place of business located at 3660 Macguire Blvd., Suite 250 in Orlando, Florida.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because several of the causes of action arise under federal law. The Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367 because they arise from the same set of operative facts.

9.     This Court has personal jurisdiction over the defendants in this action because Defendants are all citizens of the State of Florida.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are residents of Florida, at least one Defendant resides in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

A.     **Seacoast's Commercial Banking Line of Business.**

11.     Seacoast's operations in Florida are organized into three broad lines of business—Residential, Retail/Small Business and, most relevant here, the Commercial line of business where the Individual Defendants were employed.

12.     Seacoast's Commercial line of business is divided into four geographical Regions: (1) South Florida, encompassing Broward and Palm Beach counties; (2) Treasure Coast / Space Coast, encompassing Brevard, Indian River, Saint Lucie and Martin counties; (3) Central Florida, encompassing the Orlando area including Orange and Volusia counties; and (4) Tampa Bay, which includes the Tampa Bay area in Pinellas and Hillsborough counties, and some locations down to Fort Myers. Of these four Regions, South Florida and Central Florida represent the largest share of Seacoast's commercial banking business.

13.     Each of the four Regions in Seacoast's Commercial line of business is headed up by a Commercial Banking Director. In the Central Florida Region, that person was Defendant Diemer.

14.     Diemer joined Seacoast in 2012 and was the SVP who served as the Regional Director for the Central Florida Region until his sudden resignation after the close of business on December 26, 2019.

15.     In his SVP position, Diemer had ultimate supervision over all commercial business in the Central Florida Region and, along with the Directors for the other three Regions, reported directly to Executive Vice President ("EVP"), Commercial Banking Executive, Chuck Cross.

16.     Underneath the Commercial Banking Directors, each Region also has one or more Commercial Banking Managers, who in turn oversee teams of Commercial Bankers and work in conjunction with Commercial Banking Coordinators to service existing accounts and develop new business.

17.     Among the four geographic Regions, in late 2019 the Central Florida Region was Seacoast's most mature commercial business market, with three Commercial Banking Managers compared to the two in Tampa Bay and one in South Florida.

18.     Just prior to the events that gave rise to this lawsuit, Seacoast's Commercial line of business in the Central Florida Region consisted of 25 Seacoast employees.

19.     The Commercial line of business in the Central Florida Region was led by Defendant Diemer, who was the Region's Commercial Banking Director. Defendants DeSousa, Wickman and Casebier served as its three Commercial Banking Managers, with 13 Commercial Bankers divided between their teams. Defendant Littler served as the Region's Commercial Banking Coordinator Supervisor, with five Commercial Banking Coordinators reporting to him. There were also two Commercial Real Estate Bankers who reported directly to Diemer. Accordingly, the Individual Defendants made up the entire management structure for Seacoast's Central Florida commercial line of business.

20.     During the years they worked for Seacoast, Diemer and his Seacoast team managed a large portfolio of clients in their commercial banking activities. Diemer and his Seacoast team were responsible for providing credit facilities, deposit accounts and treasury management products to Seacoast's commercial banking customers. Diemer's responsibility was to manage this Seacoast team and grow the portfolio of clients, primarily in the Orlando market and surrounding Central Florida Region.

21.     Diemer was assisted by his Seacoast management team, Defendants DeSousa, Wickman, Casebier and Littler, who in turn oversaw their teams of Seacoast Commercial Bankers and/or Seacoast Commercial Banking Coordinators. Those teams were responsible

for providing advice to Seacoast customers, expanding relationships through the sale of various banking products, and acquiring additional prospect customers. Defendants DeSousa, Wickman, and Casebier did not merely manage their teams, however, but also serviced their own portfolio of Seacoast customers and worked to expand those relationships and produce new business for Seacoast. Hence, they were referred to as "producing managers."

22.     After he was hired by Seacoast in 2012, Diemer was mentored by EVP, Commercial Banking Executive Chuck Cross. Cross supported Diemer's growth of the Central Florida Region Commercial line of business over the years, and facilitated Seacoast's hiring of many of the members of Diemer's team, including the other Individual Defendants who resigned with him on December 26th.

23.     Defendants DeSousa, Wickman, and Casebier came to work for Seacoast under the supervision of Diemer as a result of two acquisitions, and initially worked as Commercial Bankers before Diemer promoted them to Commercial Banking Managers.

24.     During their employment with Seacoast, Cross provided Diemer and his team with numerous and substantial bonus incentives to recognize their good work and great future at Seacoast.

25.     For example, the Individual Defendants were at various times given certain restricted stock units ("RSUs") to reward them for past performance and incentivize future performance as a Seacoast employee. As a condition of receiving those awards, the Individual Defendants were required to, and did, execute contractual RSU agreements that laid out the various terms and conditions for their being awarded RSUs. Although the exact

terms of the RSE agreements executed by each Individual Defendant varied, all of them contained the following valid and enforceable contractual promise:

> Nondisclosure of Confidential Information. Grantee recognizes and acknowledges that Grantee will have access to certain trade secrets and other valuable, proprietary and confidential information (individually and collectively "Confidential Information") of the Company and its affiliates and that such information constitutes valuable, special and unique property of the Company and such other entities. ***Grantee will not disclose or directly or indirectly use in any manner such Confidential Information for the benefit of anyone other than the Company during Grantee's employment and for a period of two years after such employment terminates.*** To the extent any Confidential Information is required to be disclosed under applicable law or to any governmental authority, Grantee shall use his or her best efforts to protect and preserve their confidentiality and prevent their further disclosure or dissemination. ***In the event of a breach or threatened breach by Grantee of the provisions of this paragraph, the Company or the employing Affiliate shall be entitled to an injunction or temporary restraining order restraining Grantee from disclosing, in whole or in part, such Confidential Information.*** Nothing herein is intended to or shall be construed as limiting or prohibiting the Company or the employing Affiliate from pursuing any legal, equitable or other remedies available to it for such breach or threatened breach, including, without limitation, the recovery of damages. The parties acknowledge and agree that this Agreement is not intended to, and does not, alter either the Company's rights or Grantee's obligations under any state or federal statutory or common law regarding trade secrets and unfair trade practices.

(Emphasis added.)

26.     Seacoast's Employee Handbook, applicable to the Individual Defendants, also contains a policy on "Appropriation of Business Opportunities," which states:

> No associate shall take for themselves or give to another, an opportunity which belongs to Seacoast Bank. This would violate the associate's duty of loyalty to the Seacoast Bank. Whenever the bank has been seeking a particular business opportunity, or the opportunity has been offered to it, Seacoast funds or personnel have been used in developing the opportunity, the opportunity shall rightfully be that of Seacoast Bank.

(Seacoast Employee Handbook, p. 17.)

27.     Seacoast's Employee Handbook also contains a policy on "Relationship with Customers," which states:

> Confidential information with respect to customers obtained through employment with Seacoast is considered privileged and is to be held in strictest confidence. It is to be used solely for corporate purposes. Confidential information shall not be given to persons outside Seacoast, including family or associates, or even to other associates of Seacoast who have no need for the information in discharging their duties (see Customer Financial Records Privacy Policy). "Confidential information" generally consists of financial and personal information learned about customers through their accounts, records on file with the bank or personal conversations with customers.
>
> …
>
> ***Associates who end their employment with the Bank are strictly prohibited from removing or disclosing any customer information, materials or documents that are consider[ed] the Bank's property, as these are considered proprietary resources and are not the property of the associate***. Should it be discovered that the associate has committed a breach of this policy, the Bank will take remedial action, up to and including legal measures to recover any form of proprietary information and property.…

(Seacoast Employee Handbook, p. 54) (emphasis added).

28.     Over approximately six years, with the support and assistance of Cross and other Seacoast executives, Seacoast's Central Florida commercial team built a portfolio by the end of 2019 that included loans in excess of $640 million and significant associated deposits.

29.     As alleged below, on December 26, 2019, Defendants conspired to improperly and unlawfully place that entire endeavor at risk overnight through disloyal actions designed to hobble Seacoast's commercial banking business and enable the Individual Defendants to unfairly compete with Seacoast in the Florida commercial banking marketplace on behalf of One Florida Bank.

B.     **The Individual Defendants' Sudden Resignation *En Masse* from Employment with Seacoast to Work for a Competitor.**

30.     Wednesday, December 25, 2019, was Christmas Day and a bank holiday.

31.     Accordingly, many Seacoast executives were on vacation with their families during the week of December 23rd to celebrate the Christmas holiday.

32.     Fully aware of this, Defendants chose December 26th, the day after Christmas, to blindside Seacoast with mass resignations that were deliberately intended to cripple Seacoast's commercial banking operations in Central Florida.

33.     December 26th was selected as the date for this "Christmas Surprise" because Diemer and his co-conspirators knew that executing the mass resignations during Christmas week would make it extremely difficult for Seacoast to take quick action to preserve its business.

34.     As further alleged below, unbeknownst to Seacoast at that time, Diemer had taken additional unlawful steps in the days leading up to his team's resignation to steal Seacoast's trade secrets and confidential, proprietary financial information about Seacoast's commercial customers state-wide in order to enable him and his team to get an unfair head start on attempting to poach those customers for the benefit of One Florida Bank.

35.     On information and belief, DeSousa, Casebier, Wickman and several of the Commercial Bankers on their teams who joined in the mass resignations also took actions to steal Seacoast's trade secrets and confidential, proprietary financial information about Seacoast's commercial customers in each of their portfolios, in order to take that information and use it to unfairly compete with Seacoast for the benefit of One Florida Bank.

36.     Upon information and belief, the Individual Defendants had been scheming with One Florida Bank for several weeks before December 26th to "lift out" the entire Commercial line of business from Seacoast's Central Region.

37.     None of the Individual Defendants had disclosed to Seacoast executives, at any point prior to the evening of December 26th, that they were in communications with One Florida Bank and were planning to depart *en masse*.

38.     On December 26, 2019, Cross was on vacation. Around 5:00 P.M. that evening, Dimer called Cross on his cell phone while he was in a theatre watching the new Star Wars movie with his family. After the movie ended, Cross called Diemer back from the parking lot, told him he was with his family, and asked if they could talk in a few minutes after Cross got back home.

39.     Cross called Diemer back around 5:30 P.M. from his home. During that call, Diemer blindsided Cross with the news that he was leaving Seacoast with a group from the Central Florida commercial banking line of business that included eight bankers and three banking coordinators, and that they were going as a group to a new bank in Orlando called One Florida Bank. The group included Diemer and his entire Central Florida management team—*i.e.*, DeSousa, Casebier, Wickman and Littler—as well as the five top Commercial Bankers under DeSousa, Wickman and Casebier, and the two top Commercial Banking Coordinators under Littler's supervision. This mass resignation represented a loss to Seacoast of approximately half of the employees in its Central Florida commercial line of business, including its entire management structure.

40.     Diemer further informed Cross during that call that the group's resignations were effective immediately, and that they would not be giving Seacoast a customary two-week notice period because One Florida Bank needed them all to start before 2019 ended. Diemer said that One Florida Bank wanted to take a one-time expense hit during 2019 to cover all the starting bonuses that it was paying to these Seacoast employees to get them to switch banks.

41.     Specifically, Diemer told Cross that One Florida Bank was cashing Diemer and his team out of the year-end bonuses that they would have received if they had stayed at Seacoast, and was also cashing them out of their unvested Restricted Stock Unit ("RSU") awards. These unpaid year-end bonuses amounted to approximately $540,000, and the value of the unvested RSUs amounted to approximately $902,000. Thus, the one-time "expense hit" that Diemer indicated One Florida Bank had taken would have been in excess of $1.4 million.

42.     Because the Individual Defendants had not given any notice of their resignations, and because none of them was willing to work out the standard two-week notice and transition period that is customary in the Florida banking industry, Cross asked Diemer if he thought that it might be in their customers' best interest if they took some time to meet and go through the group's portfolios to make sure that their customers' transitions to new Seacoast representatives would be handled properly. Diemer did not respond to that inquiry. He subsequently ended the call by telling Cross that he would be sending Cross an email containing all the resignation letters that he had gathered together from the other Individual Defendants and the seven other employees who were resigning.

43.     Based on his 40-plus years in Florida commercial banking, Cross found it highly unusual, and inconsistent with what is expected by managers in the banking industry, for the Individual Defendants to resign without notice and refuse to work out a notice period.

44.     The sudden manner in which Diemer had informed Cross of the news that 12 members of the commercial banking team were all leaving together—and were all declining to work out a notice period that would allow Seacoast to properly develop a transition plan for its customers—created significant challenges for Cross and Seacoast's executive leadership. The timing of the resignations during the Christmas holiday, while Cross was out on vacation, made it particularly difficult for Seacoast to react.

45.     Cross ended the phone call by telling Diemer that he needed to talk to some other Seacoast executives that night, and would call Diemer back shortly.

46.     At approximately 6:11 P.M. on December 26th, Diemer followed up the call with an email to Cross. Attached to the email were resignation letters for all 12 of the departing employees. Diemer had collected this group of resignation letters from 11 other members of his Seacoast team, and sent them to Cross all at once.

47.     In his email, Diemer did not offer any notice of his departure, and did not offer to work a standard two-week notice period to help Seacoast transition his responsibilities to a replacement employee.

48.     None of the other Individual Defendants who left with Diemer offered any notice of their departures. They did not offer to work a standard 2-week notice period to help Seacoast transition their responsibilities to replacement employees. They also did not

personally communicate with Cross or any other Seacoast executives about their resignations.

49.     None of the Commercial Bankers who left with Diemer offered any notice of their departures. They did not offer to work a standard 2-week notice period to help Seacoast transition their responsibilities to replacement employees. They also did not personally communicate with Cross or any other Seacoast executive about their resignations.

50.     Neither of the Commercial Banking Coordinators who left with Diemer offered any notice of their departures. They did not offer to work a standard 2-week notice period to help Seacoast transition their responsibilities to replacement employees. They also did not personally communicate with Cross or any other Seacoast executive about their resignations.

51.     Before the call on the evening of December 26th, Diemer had never suggested to Cross, who had been his boss for years, that he was unhappy at Seacoast or was considering a move.

52.     Before the call on the evening of December 26th, Diemer had never reported to Cross that other Seacoast employees that reported to Diemer were unhappy or looking to move.

53.     Around 7:00 P.M. on December 26th, Cross called Diemer back. During that brief conversation, Cross explained that he would be driving to the Orlando area the following morning with two other Seacoast executives—the Executive Vice President and Chief Human Resources Officer, and Seacoast's COO/CFO—in order to meet with all 12 of

the departing employees individually. The goal was to address the employees' concerns and encourage them to remain employed at Seacoast.

54.     Diemer told Cross that he would get on the phone that night with the other employees to arrange those meetings, and gave no indication that it would be a problem, or that any of the employees were unavailable. Cross understood that Diemer would talk to the other employees and call him back that night.

55.     Throughout these communications on December 26th, and in communications that followed over the next several days, Diemer was speaking for himself and each member of the Seacoast team that resigned. Through his comments and actions, it was clear that Diemer was the ringleader of the group of resigning employees.

56.     Diemer did not call Cross back later that night. The next communication from him arrived at 10:27 p.m. via a text message to Cross. In that message, Diemer claimed that no one from his team would be able to meet the following day, December 27th, because "everyone is taking time off between Christmas & New Years."

57.     Seacoast later learned that Diemer's claim about the employees' unavailability for work on December 27th was a false statement.

58.     Diemer also indicated in his text message at 10:27 P.M. on December 26th that he was "heading out of town and will not be available" to meet with Cross in person on the morning of December 27th. Diemer had failed to mention that alleged fact a few hours earlier during the phone call wherein (i) Cross had asked to meet with Diemer on December 27, and (ii) Diemer had indicated that it could be arranged.

59.     Cross sent Diemer several text messages in response, but Diemer did not answer them.

60.     Some or all of the Seacoast employees who resigned after business hours on December 26th began work at One Florida Bank on Friday December 27th (the next morning).

61.     Thus, contrary to Diemer's false statement to Cross the night before, some or all of the Individual Defendants, and/or other members of the Seacoast team, in fact showed up at One Florida Bank on the following morning of December 27, 2019, to begin their new jobs in direct competition with Seacoast.

**C.      Defendants' Wrongful Conduct.**

62.     The sudden resignations of Diemer and his team, and the hollowing-out of Seacoast's Commercial line of business in the Central Florida Region, threatened Seacoast with the immediate defection of customers in its Central Florida commercial portfolio, as well as the loss of future growth.

63.     The fact that Diemer and his Seacoast team chose to execute their resignations with no notice, in the middle of the holiday season, gave Seacoast no opportunity to prepare for such a significant loss or otherwise ensure an orderly transition for Seacoast's customers.

64.     In addition, because a significant number of the business owners who did commercial banking with Seacoast (*e.g.*, commercial real estate loans, equipment loans, revolving loans and other lines of corporate credit) also used Seacoast for their personal banking needs (*e.g.*, residential mortgage and wealth management services), the mass defection of Diemer, his Seacoast management team and their top-performing Bankers also threaten Seacoast with losses to Seacoast's non-commercial lines of business as well.

65.     On information and belief, and as indicated by the joint submission of their resignation letters by Diemer, the mass resignation of the top-performing half of Seacoast's Central Florida commercial employee base was coordinated by the Individual Defendants through active solicitation of subordinates to leave their employment with Seacoast and work for One Florida Bank. Such solicitation was done while the Individual Defendants were still employed by Seacoast in senior management positions, and owed Seacoast a duty of loyalty and candor in the performance of their job duties.

66.     On information and belief, the coordinated solicitation and raiding of Seacoast's Central Florida commercial line of business by the Individual Defendants was conducted with the knowledge, support and/or encouragement of One Florida Bank, where the Individual Defendants immediately began working the day after they resigned from their employment with Seacoast without prior notice.

67.     On information and belief, the mass resignations of Diemer and his team were executed in the above manner in a deliberate attempt to disrupt and interfere with Seacoast's Central Florida operations, and to prevent Seacoast from having any opportunity to reach out to the departing Bankers or otherwise effectively respond after learning about the mass resignations.

68.     For example, due to the lack of notice provided by Diemer and his team, Seacoast will be forced to rapidly shift resources from other parts of its business to reach out to its Central Florida Region customer base to maintain those important relationships, and to incur substantial recruiting costs in order to replace the Bankers, Managers and Regional Director that it lost without warning.

69.     In the current economic environment, Seacoast expects to spend months, at a minimum, trying to replace these employee losses, a delay that could easily have been mitigated, if not altogether avoided, if Diemer and his team had provided at least some prior notice of their intent to move to a competitor rather than leaving suddenly, all in a group and without notice.

70.     It is a custom of the trade in the Florida banking business for employees to provide a minimum of two-weeks' notice at the time that a resignation is submitted.

71.     The fact that Diemer and his Seacoast team did not provide Seacoast with customary advance notice, or agree to work out a standard two-week transition period, evidences the fact that their resignations were deliberately coordinated to maximize the disruption to Seacoast's Central Florida business and provide One Florida Bank with an unfair advantage in seeking to poach Seacoast's customer base in that Region.

**D.      The Individual Defendants' Misappropriation of Seacoast's Trade Secrets Shortly Before They Resigned Without Notice.**

**1.      Seacoast's proprietary and trade secret Relationship Profitability System.**

72.     Over the past several years, Seacoast has invested a substantial amount of time and resources into developing its technological ability to utilize the vast amount of customer information it gathers from multiple sources over time in order to better serve its customers' needs. One of the most effective tools that Seacoast has developed in this regard is the Relationship Profitability System, or "RPS."

73.     RPS is a proprietary and powerful tool for aggregating and mining data from numerous proprietary and third-party sources to gain insight into Seacoast customers and serve them better. While other banks may have comparable customer relationship summaries,

the RPS tool was developed within Seacoast and is proprietary to Seacoast. Indeed, Seacoast built RPS in-house over approximately six months and 1000 hours of development, and details regarding the RPS technology have never been publicly disclosed.

74.     On information and belief, RPS has unique features that are not available at other banks, and are highly valuable to managing Seacoast's customer relationships.

75.     The databases on which RPS relies contains highly confidential and trade secret banking and financial information about all of Seacoast's commercial customers, as well as proprietary and trade secret information relating to Seacoast's relationships with those customers. RPS does not contain information about any other businesses that are not Seacoast commercial banking clients.

76.     RPS provides a proprietary and confidential "360 degree" snapshot into the business that Seacoast's customers do with the Bank. Among other things, RPS can rank those customers in real-time from highest to lowest in terms of their monthly profitability for the Bank. In a portfolio view accessible through the RPS web portal, RPS can then display those results in an easily digestible list showing the most important, and confidential, data points for each customer in a given portfolio, twenty customers to a page.

77.     More specifically, RPS provides an efficient means for Seacoast commercial bankers to obtain valuable and proprietary insight into all relevant statistics for their commercial banking customers, including but not limited to loan values and deposit information, balances and recent activity, customer habits and preferences, monthly profitability and lifetime value, as well as marketing opportunities and special offers for which clients may be eligible. RPS also enables the users to trend any of this information

over a two-year period to provide additional insight, and to help forecast any particular customer's profitability for the bank going forward.

78. The data contained within an RPS portfolio report is confidential and proprietary to Seacoast. Accordingly, it is well-protected.

79. The RPS web portal is only accessible by authorized Seacoast employees. Access is never granted to other individuals or organizations outside Seacoast, and even internal access within Seacoast is restricted and limited by job necessity, as detailed below.

80. Not only does much of the information aggregated by and contained in RPS constitute trade secrets belonging to Seacoast, but the easy-to-navigate manner in which that information is sorted and presented to the user by the RPS web interface is *itself* a trade secret, and provides a significant competitive advantage to Seacoast employees with access to the RPS portal.

81. To obtain the same information without RPS would be a laborious process that would require a Seacoast employee to search at least a half-dozen separate data sources in Seacoast's systems, whereas RPS enables the employee to quickly and easily view an entire portfolio of customers at a glance. RPS further allows the user to sort the customer lists according to various aggregated metrics, including the customers' monthly and/or lifetime value and profitability for Seacoast. In short, RPS provides a quick and easy way for an authorized Seacoast user to view the most important proprietary information and metrics about the most important Seacoast customers in their portfolio, all in one place.

82. Seacoast goes to great lengths to protect the information in RPS, both because it is valuable to the Bank and because Seacoast's customers expect the Bank to hold their

confidential financial and banking information in confidence. No customer would allow Seacoast to publish or disclose confidential information about their accounts and loans they have with the Bank without specifically authorizing it to do so. Accordingly, Seacoast never shares the information in RPS with the public, and certainly would never provide it to one of Seacoast's competitors.

83.     Because of its competitive value, customer information in the RPS database is highly restricted to ensure that it remains secret from competitors, and is only viewable on a need-to-know basis. For example, each Seacoast banker's access to RPS is restricted to their own portfolio of accounts, while management-level employees can only access their own portfolio and that of the bankers they are responsible for supervising. Only the highest-level Seacoast executives are able to access the full customer database contained in RPS.

84.     Diemer was a trusted, high-ranking executive at Seacoast when RPS was launched, and he was designated as an official "champion" for RPS amongst the entire commercial banking team after its roll-out. In this capacity, Diemer was expected to encourage and coach usage across all commercial bankers, and work with Seacoast's technology team on future enhancements.

85.     Because of his high rank and his role as an RPS champion, and because he was trusted not to abuse his authority or misuse RPS for non-business-related ends, Diemer was one of the very few executives whose access to the full RPS database was not automatically restricted. As detailed below, however, any access to the RPS database—by Diemer or any other Seacoast employee—was only authorized to the extent it was business-related and necessary to fulfill his job duties for Seacoast.

86.     Seacoast takes significant additional measures to protect the secrecy and integrity of the customer information stored in RPS. All access is password-protected and subject to strict information security guidelines, which each Seacoast employee must re-affirm on an annual basis. For example, Seacoast's End User Computing Policy provides as follows:

> All data generated, stored or processed by Bank computer systems is the property of Seacoast Bank. Associates, including contractors, may access, use or share proprietary information ***only to the extent it is authorized and necessary to fulfill assigned job duties***. Removal of data, specifically customer non-public information (CNPI), in any format, is prohibited. Examples include, but are not limited to:
>
> • Exporting lists containing customer information
> • Exporting contact information from Outlook
> • E-mailing or uploading Bank proprietary data outside of the network.
>
> The Bank reserves the right to monitor all computers, network, Internet, E-mail and telephone activity by Associates, contractors and other system users.

(Emphasis added.)

87.     The End User Computing Policy also prohibits copying any CNPI or other company sensitive information to any portable media (*e.g.*, a USB drive) that is not one of the encrypted USB drives obtained from Seacoast's own IT department, and all non-encrypted USB drives are disabled and non-functional on all Seacoast computers. Users are also administratively prevented from exporting large lists of data from RPS. Employees are also prohibited from viewing, storing or processing any CNPI or sensitive company data on non-bank approved devices.

88.     The End User Computing Policy also provides that employees must ensure their desk is free of documents containing CNPI at the end of each business day if they do

not have an office with a locking door, and that all sensitive company information must be stored in locked drawers and file cabinets out of public view. Unattended computers must also be locked when an employee is away from his or her desk.

89.     In addition, Seacoast maintains a comprehensive, 21-page Information Security Policy that covers all aspects of the bank's data security practices to protect its sensitive, confidential information from unauthorized access, use, disclosure, modification or destruction. Among other protections, the Information Security Policy establishes requirements for access control on Seacoast networks, password strength, network usage for business-related purposes, data confidentiality and data privacy.

90.     Similar to the End User Computing Policy, the Information Security Policy likewise provides:

> All data generated, stored or processed by Bank computer systems is the property of Seacoast Bank. Associates, including contractors, may access, use or share proprietary information ***only to the extent it is authorized and necessary to fulfill assigned job duties***. Removal of data, specifically customer non-public information (CNPI), in any format, is prohibited.

(Emphasis added.)

91.     The Individual Defendants all received and affirmed their understanding of the policies set forth above on an annual basis during their employment with Seacoast.

92.     Seacoast takes additional steps to ensure the physical security of its data, including the data relied on by RPS. In order for RPS to function effectively, Seacoast had to establish its own enterprise data warehouse to store the approximately 19,000–21,000 pieces of information it has on each customer all in one place. All of this information is stored on servers owned by Seacoast (*i.e.*, not on a third-party cloud system), and physically located in

a locked, secure cage within a secure data warehouse where Seacoast leases space. The warehouse provides electricity, cooling systems and network access, and also restricts physical access to Seacoast's servers through multiple layers of security (*e.g.*, badge requirements, authorization lists, and numerous door locks).

> **2.** **Diemer accesses RPS without authorization after business hours and prints trade secret and confidential customer information in the days prior to his resignation.**

93.     As alleged above, Diemer's high-level management position and trusted status as an RPS "champion" gave him extensive access to Seacoast's confidential information and trade secrets, including unrestricted access to RPS that only a handful of other very senior management personnel enjoyed.

94.     This high level of access not only enabled Diemer to view trade secret information about the Seacoast customers he managed, and those managed by his Seacoast team, but also gave him access to virtually the entire database of Seacoast commercial customers numbering in the thousands, regardless of whether those customers fell under his management umbrella or were managed by other senior personnel and/or their teams.

95.     As further alleged above, per the Information Security and End User Computing policies that Diemer affirmed his agreement to on an annual basis, his access to the RPS database was authorized only to the extent that such access was "necessary to fulfill assigned job duties" for Seacoast.

96.     After the sudden resignation of Diemer and his Seacoast team without notice, Seacoast began a forensic investigation into its computer and email systems, databases and networks, which is still ongoing.

97.     Through this investigation, Seacoast discovered certain unusual and suspicious activities that occurred in the RPS web portal in the days leading up to the mass resignations of Diemer and his team.

98.     For example, there were two significant and abnormal spikes in total page views in RPS in late December 2019. As context, between November 1 and December 19, the average total number of page views in the RPS system was approximately 13.6 views per day for all users (*i.e.*, not 13.6 views *per user*, but for *all* users per day). On December 20th, however, there were 107 page views recorded. Similarly, on December 26th, there were 128 page views recorded for the RPS web portal.

99.     An additional anomaly discovered was that the average "time on page" for December 20th and 26th was substantially lower than would be expected if the page view spikes had simply resulted from an increase in normal usage of RPS by Seacoast employees.

100.    Further forensic investigation has revealed that, between approximately 6:33 P.M. and 6:43 P.M. on December 20, 2019, a user with high-level access to RPS viewed numerous pages of a customer list for accounts under the management umbrella of EVP Commercial Banking Executive Chuck Cross (*i.e.*, Diemer's boss). This list constituted virtually the entire commercial banking customer base for all of Seacoast throughout Florida—including customers outside Diemer's Central Florida Region—and displayed multiple columns of confidential, highly valuable, proprietary and trade secret information about each Seacoast customer.

101.    Seacoast further discovered that the customer list was sorted, from highest customer to lowest customer, according to each customer's Monthly Contribution. Monthly

Contribution is a proprietary metric compiled by RPS through a gathering and analysis of customer information from numerous sources, and constitutes Seacoast's trade secret.

102.    During its investigation, Seacoast further discovered that the viewer of the above-described customer list had clicked through approximately sixty (60) pages of information, with approximately 20 customers visible per page, and spent an average of approximately 10.5 seconds on each page (with the majority of page views being between seven and nine seconds, and a handful of page views lasting for 30–60 seconds).

103.    Web page logs also reveal that, on December 26, 2019, between approximately 2:22 P.M. and 2:49 P.M.—*i.e.*, approximately four hours before Diemer first informed Cross that he and 11 members of his team were immediately resigning to work for a competitor bank—someone with high-level access to RPS viewed the detailed customer list, also sorted by customer value, for every Seacoast customer under Diemer's management umbrella, including all customer accounts managed by his subordinates.

104.    Similar to the December 20 activity, the viewer had methodically clicked through over eighty (80) pages of confidential, proprietary and trade secret information about Seacoast customers, viewing approximately 20 customers' information per page, and spending an average of approximately 10.5 seconds on each page.

105.    The RPS activity described above was highly unusual for any user of RPS to engage in, as there is no apparent job duty that would require any RPS user to access the subject information in that manner. It was particularly suspicious that this activity was taking place on the day after Christmas, when relatively little ordinary commercial banking activity was occurring.

106.    Through further forensic investigation, Seacoast has been able to attribute the highly unusual page-view activity in RPS described above to a single IP address. That IP address was the one assigned to the company-issued laptop used by Diemer, and was one that would only be used if that laptop was accessing Seacoast's network from inside Seacoast's office building in Lake Mary, Florida.

107.    Seacoast's Information Security team has also been able to confirm through other electronic sources that Diemer's laptop was in fact logged on to Seacoast's network on December 20th and 26th, at the same time that the suspicious RPS activity was taking place.

108.    Most alarmingly, Seacoast's Information Security team has been able to confirm that Diemer not only methodically reviewed confidential and trade secret customer information in RPS on December 20th and 26th, but also that he printed a substantial amount of confidential information from RPS to a local printer in the Lake Mary office, only hours before he would notify Cross of his team's resignation *en masse*.

109.    Electronic logs from Diemer's activities on the Seacoast network show that he was initiating numerous print jobs on December 20th and 26th, around the same time that he was reviewing the RPS data.

110.    An electronic log on the printer located nearest and most conveniently to Diemer's desk in the Lake Mary building also shows that his "mdiemer" user account initiated numerous print jobs during the relevant time period on December 26th, most of which were one or two pages each, and sometimes including several print jobs within the span of a minute. The logs further show that the data being printed was from numerous URL addresses originating in the RPS web application.

111.    The "mdiemer" printer log activity is consistent with someone clicking through pages of customer lists in RPS and spending a short amount of time on each page to repeatedly print the information displayed on the screen.

112.    The RPS viewing and printing behavior that Diemer engaged in was highly unusual, and not consistent with the way other Seacoast employees use RPS in performing their job duties. It was especially unusual and suspicious for Diemer to be engaging in such activity just a few hours before he and his team resigned from employment with Seacoast.

113.    There is no legitimate reason why Diemer's job would require him to engage in the RPS activity shown by the logs—including methodically reviewing RPS customer information after hours on the Friday before Christmas—if he was imminently planning to resign from his employment with Seacoast to work for a competitor.

114.    In particular, Diemer had no reason to look at the statewide portfolio of customers at any time, regardless of whether he intended to resign his employment with Seacoast. Indeed, in the days immediately before he resigned, Diemer had no true Seacoast business reason for looking even at his own customer portfolio and/or those of his subordinates.

115.    The only plausible explanation for Diemer's activity is that he wanted to unlawfully obtain confidential information about Seacoast's commercial banking customers to take that stolen information with him when he left to work for One Florida Bank.

116.    The files Diemer accessed and/or printed contain confidential, proprietary and trade secret banking and financial information about Seacoast's customers all over Florida.

Indeed, the information on the RPS reports that Diemer was reviewing and printing in his last days as a Seacoast executive is some of Seacoast's most protected customer information.

117.    In the hands of an unethical competitor, the information reviewed and/or printed by Diemer would provide a roadmap to identifying and "picking off" Seacoast's customers unfairly by using highly confidential Seacoast banking information.

118.    Diemer's actions in reviewing and printing the RPS information in anticipation of leaving to join a competitor bank have placed Seacoast's important relationships with numerous valued customers at risk.

119.    Further investigation is ongoing to determine what other unusual processes or activity may have occurred on Diemer's laptop during the relevant time period.

**3.      The other Individual Defendants methodically reviewed their RPS portfolios just before resigning and, on information and belief, printed or otherwise recorded the trade secret and confidential customer information contained therein.**

120.    Seacoast's investigation into the Individual Defendants' computer activities has also uncovered evidence that several of the other former Seacoast employees who resigned on December 26th engaged in similarly suspicious RPS activity in the days leading up to their resignation, including all three of the resigning Bankers that were managed by Wickman. More specifically:

- Shane McCutchen, one of the Commercial Bankers under Wickman who resigned with the group, clicked through his complete portfolio (involving 14 pages) in a similar methodical manner as Diemer. This activity likewise occurred on December 26th from approximately 11:10 A.M. to 12:26 P.M.

- Defendant Casebier clicked through part of his portfolio (involving 6 of 19 pages) in a similar manner on December 22, 2019, from approximately 8:18 A.M. to 8:21 A.M.

- Kenneth Kunkel, another Commercial Banker under Wickman who resigned with the group, clicked through part of his portfolio (involving 3 of 4 pages) in a similar manner on December 13, 2019, from approximately 11:35 A.M. to 11:37 A.M.

- Robert Cieswick, another Commercial Banker under Wickman who resigned with the group, clicked through a substantial part of his portfolio (involving 10 pages) in a similar manner on December 5, 2019, from approximately 12:49 P.M. to 1:02 P.M.

- Defendant DeSousa clicked through part of his portfolio (involving 9 of 14 pages) in a similar manner on December 4, 2019, from approximately 1:42 P.M. to 3:35 P.M.

- Brian Wickman reviewed his complete portfolio (involving 7 pages) in a slower fashion on December 19, 2019, from approximately 10:25 A.M. to 1:23 P.M.

121.    Although some of the former employees listed above only viewed part of their portfolios, RPS sorts a user's portfolio such that the most valuable customers are displayed first. Thus, the first several pages displayed in an RPS report contain the confidential information about the most important customers in any given portfolio.

122.    The RPS activity that the above employees engaged in was highly unusual, and not consistent with the way other Seacoast employees typically use RPS in performing their job duties.

123.    On information and belief, DeSousa, Casebier, Wickman and the other former employees referenced above were engaging in the above-described RPS activity for the purpose of obtaining confidential information about the Seacoast customers in their portfolios to take with him when they left to work for One Florida Bank.

124.    On information and belief, the above-referenced former employees printed, photographed, took notes on, or otherwise recorded and/or retained the confidential and trade secret information displayed on the RPS pages that they were viewing.

125.    On information and belief, the above-referenced former employees engaged in this conduct in order to use Seacoast's confidential, proprietary and trade secret customer information to unfairly compete with Seacoast on behalf of One Florida Bank.

126.    Further investigation is ongoing to determine the full extent of the Individual Defendants' computer activities in the days and weeks leading up to their departure.

## CAUSES OF ACTION

### Count I

### Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*
### (Against Diemer, DeSousa, Casebier, Wickman and One Florida Bank)

127.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 126 above as if fully set forth herein.

128.    During their employment, and strictly for purposes of fulfilling their Seacoast job duties, Diemer, DeSousa, Casebier and Wickman (the "Misappropriation Defendants") were given access to trade secrets pertaining to Seacoast's customer base, including but not limited to the confidential customer information, financial data, trends and ranking metrics in the proprietary RPS portal. In particular, the ranked listing of Seacoast's customers according to their monthly contribution and lifetime value to Seacoast—which is compiled and produced by RPS based on aggregated data from numerous proprietary and/or third-party sources—constitutes a trade secret of enormous competitive value.

129.    While the majority of Seacoast's customers are based in Florida, some are not. Moreover, many of Seacoast's Florida-based customers do business in, or have operations in, other states, or even internationally. Through its commercial lending activity, Seacoast also

finances numerous customer activities related to foreign and interstate commerce. For these and other reasons, the trade secrets contained in RPS about Seacoast's customers include trade secrets related to products or services used in, or intended for use in, foreign or interstate commerce.

130.    The information contained in RPS, as well as the RPS interface that enables that information to be easily and efficiently organized and viewed, derives independent economic value from not being generally known or readily ascertainable by other persons who can obtain economic value from its disclosure or use, and confers on Seacoast a competitive advantage over other companies in the industry that do not have or use RPS and/or the information it contains.

131.    As set forth above in paragraphs 82–92, Seacoast takes reasonable efforts to maintain the secrecy of the information contained in RPS, and to restrict access to that information within the RPS interface itself. As set forth in paragraph 25, Seacoast also requires recipients of restricted stock awards to agree to a confidentiality provision protecting against the use or disclosure of confidential and/or trade secret customer information belonging to Seacoast like the customer information contained in and displayed by RPS. As set forth in paragraphs 26 and 27, Seacoast has also implemented handbook policies to prohibit misuse of its confidential customer information.

132.    As set forth above in paragraphs 93–119, in the days before the coordinated mass resignation of Diemer and his Seacoast team without notice, Diemer logged on to RPS on two separate occasions, then reviewed and/or printed off highly confidential and valuable trade secrets regarding *thousands* of Seacoast's customers.

133.    Defendant Diemer accessed Seacoast's RPS database of customer information on December 20, 2019.

134.    On December 20th, Defendant Diemer methodically clicked, page by page, through 40 pages of confidential and proprietary information about 800 Seacoast commercial banking customers, including customers outside the Central Florida Region where Diemer had management responsibilities.

135.    Diemer had no legitimate business reason to review this highly confidential Seacoast customer information on the evening of Friday, December 20th, just six days before he would resign from Seacoast without warning. In particular, Diemer had no legitimate business reason or other authorization to be methodically reviewing confidential and proprietary information in RPS regarding Seacoast customers that were outside his own management umbrella, and that instead fell under the management of his boss, Chuck Cross.

136.    On December 26th, only hours before he would resign without notice, Defendant Diemer again methodically clicked though 86 pages of confidential and proprietary information about more than 1,700 Seacoast commercial banking customers, including the portfolios of all of his subordinates, and including the portfolios of those subordinates who did not resign with him later that day.

137.    On December 20 and 26, 2019, Defendant Diemer exceeded his authorization to access the customer information contained in RPS in order to misappropriate the trade secret customer information and metrics that RPS enabled him to quickly view through its trade secret user interface. Defendant Diemer did not do this to perform any assigned

Seacoast job duty that would have authorized such access. To the contrary, he did this in order to compete unfairly against Seacoast as an employee of One Florida Bank.

138. On December 20 and 26, 2019, Defendant Diemer did print and misappropriate trade secret customer information from RPS about hundreds, and potentially thousands, of Seacoast customers. Diemer did so not for the purpose of performing any job duties on behalf of Seacoast, but rather to enable him and his team to unfairly compete with Seacoast for the benefit of One Florida Bank.

139. Similarly, as set forth in paragraphs 120–126 above, in the days and/or weeks before the coordinated mass resignation, DeSousa, Casebier and Wickman, as well as several of their subordinates, also logged on to RPS and methodically reviewed some or all of their portfolios.

140. On information and belief, DeSousa, Casebier, Wickman and their subordinates printed, photographed, surreptitiously downloaded or otherwise took the confidential and trade secret information pertaining to some or all of the customers in their RPS portfolios when they accessed the RPS portal during December 2019.

141. The Misappropriation Defendants took Seacoast's trade secrets for purposes of using them to unfairly compete with Seacoast on behalf of One Florida Bank.

142. When the Misappropriation Defendants took Seacoast's trade secrets for purposes of using them to compete with Seacoast, they did so knowing that they were resigning imminently, and would immediately begin working at One Florida Bank.

143. As such, when the Misappropriation Defendants took Seacoast's trade secrets for purposes of using them to compete with Seacoast, they were effectively acting as agents

of One Florida Bank, to further their employment with One Florida Bank, and for the benefit of One Florida Bank, and therefore One Florida Bank is vicariously liable for their actions.

144. On information and belief, the Misappropriation Defendants have used, or are imminently threatening to use, Seacoast's trade secrets to their pecuniary advantage, and in order to further the efforts of themselves and their subordinates on behalf of One Florida Bank.

145. The Misappropriation Defendants' misappropriation of Seacoast's trade secrets was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and were foreseeably likely to cause to Seacoast.

146. Through their misappropriation of Seacoast's trade secrets, the Misappropriation Defendants have proximately caused substantial injury to Seacoast for which it is entitled to recover damages and, as permitted by the DTSA, exemplary damages.

147. Seacoast has or will sustain irreparable harm as a direct and proximate result of the unlawful actions taken by the Misappropriation Defendants. Unless otherwise restrained by this Court, the Misappropriation Defendants, acting as agents of One Florida Bank, will continue to unlawfully utilize Seacoast's trade secrets to unfairly compete with Seacoast and cause it irreparable injury, including reputational harm, for which there will be no complete and adequate remedy at law.

148. Defendants are not entitled to any revenues that either has realized stemming from the Misappropriation Defendants' unlawful acts. The Misappropriation Defendants and One Florida Bank must disgorge and return to Seacoast all such payments or revenues. Seacoast is likewise entitled to a reasonable royalty and all other damages and remedies

available at law, including equitable relief, compensatory damages and attorneys' fees and expenses of litigation.

## Count II

### Misappropriation of Trade Secrets
### Under the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 *et seq.*
### (Against Diemer, DeSousa, Casebier, Wickman and One Florida Bank)

149. Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 148 as if fully set forth herein.

150. In addition to a violation of the federal DTSA, the allegations set forth in paragraphs 128 through 148 above, which are incorporated herein by reference, also state a claim for misappropriation of trade secrets under FUTSA and Florida state law by the Misappropriation Defendants.

151. Through their misappropriation of Seacoast's trade secrets, the Misappropriation Defendants have proximately caused substantial injury to Seacoast for which it is entitled to recover damages and, as permitted by FUTSA, exemplary damages.

152. Seacoast has or will sustain irreparable harm as a direct and proximate result of the unlawful actions taken by the Misappropriation Defendants. Unless otherwise restrained by this Court, the Misappropriation Defendants, acting on behalf of One Florida Bank, will continue to unlawfully utilize Seacoast's trade secrets to unfairly compete with Seacoast and cause it irreparable injury, including reputational harm, for which there will be no complete and adequate remedy at law.

153. One Florida Bank is vicariously liable for the Misappropriation Defendants' misappropriation of Seacoast's trade secrets because the Misappropriation Defendants were

acting as agent of, and for the benefit of, One Florida Bank when they committed the unlawful misappropriation of Seacoast's confidential, proprietary and trade secret customer information.

154.    The Misappropriation Defendants and One Florida Bank are not entitled to any revenues that either has realized stemming from Diemer's unlawful acts. Diemer and One Florida Bank must disgorge and return to Seacoast all such payments or revenues. Seacoast is likewise entitled to a reasonable royalty and all other damages and remedies available at law, including equitable relief, compensatory damages and attorneys' fees and expenses of litigation.

<u>**Count III**</u>

<u>**Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C)**</u>
**(Against Diemer)**

155.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 154 as if fully set forth herein.

156.    The CFAA prohibits a person from intentionally accessing a protected computer and exceeding his or her authorized access to obtain information from that protected computer.

157.    Seacoast's network, and in particular the RPS database, constitute "protected computers" as defined by Section 1030(e)(2)(B) of the CFAA.

158.    On December 20 and 26, 2019, Diemer intentionally and improperly accessed Seacoast's RPS portal in a manner that exceeded his authorized access, as it was to obtain confidential, proprietary and/or trade secret information about Seacoast customers for the

purpose of using that information to compete with Seacoast, and not for purposes of completing his job duties for Seacoast.

159.    Diemer's accessing of the subject information in RPS for such purposes was unauthorized and in violation of Seacoast's Information Security and End User Computing policies that Diemer was aware of and had agreed to on an annual basis.

160.    Diemer's unauthorized access of Seacoast's network and/or the ranked customer value information for all Seacoast customers in RPS has caused and will continue to cause Seacoast to suffer injury, with "damages" and "losses," as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the CFAA, respectively, in excess of $5,000.00 within a one-year period.

161.    For example, Seacoast has already spent well in excess of $5,000 to engage a third-party technology consultant to conduct a thorough forensic analysis of the Individual Defendants' physical laptops and network activity in the days leading up to their mass resignation, in order to determine the activity they engaged in and to assess what information was taken by Diemer and/or the other employees who resigned. To complete this investigation—which Seacoast *must* do because of its duty to protect its customers' confidential information and determine the full extent of what has been taken—will ultimately cost Seacoast tens of thousands of dollars in consulting fees, not including the time that Seacoast's own Information Security team has invested in the initial effort to respond to and investigate the Individual Defendants' suspicious computer activities.

162.    To date, Seacoast has lost at least 100 hours of productivity for its in-house Information Security team in investigating and responding to the Individual Defendants'

suspicious and/or unlawful computer activities in the days prior to their sudden mass resignation.

163.　Diemer's activities constitute intentionally accessing a computer without authorization or exceeding authorized access and thereby obtaining information from any protected computer, in violation of 18 U.S.C. § 1030(a)(2)(C).

164.　Pursuant to 18 U.S.C. § 1030(g), Seacoast is entitled to maintain this civil action against Diemer to obtain compensatory damages and injunctive and other equitable relief.

## <u>Count IV</u>

### <u>Breach of the Duty of Loyalty Owed to Seacoast</u>
### (Against the Individual Defendants)

165.　Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 164 as if fully set forth herein.

166.　As a result of their employment with Seacoast, and based on the senior management positions they held at the company, the Individual Defendants owed Seacoast a duty of good faith, honesty, candor, and loyalty in the performance of their duties.

167.　While still employed as a high-level SVP with Seacoast, Diemer coordinated the mass resignation of 11 other members of his Seacoast team, collected their resignation letters and submitted them to his boss with no prior warning on the day after Christmas.

168.　Throughout his communications with Cross on December 26th, and in communications that followed over the next several days, Diemer spoke for himself and each member of the Seacoast team that resigned. Through his comments and actions, it was clear that Diemer was the ringleader of the group that resigned *en masse*.

169.    Diemer had a financial incentive to encourage other Seacoast employees to join him at One Florida Bank, as he stood to gain directly by bringing on an experienced team with developed loan pipelines and relationships with Seacoast customers.

170.    Diemer breached the duty of loyalty he owed to Seacoast during the term of his employment. He did so by putting his own interests above those of the company; by improperly accessing Seacoast's trade secrets in order to use them to unfairly compete against Seacoast; by soliciting at least eleven (11) subordinate employees to leave their employment with Seacoast *en masse* and come work for Diemer at a direct competitor; and by coordinating and executing a mass resignation of his team from Seacoast in a manner designed to cripple Seacoast's operations in the Orlando area.

171.    The other Individual Defendants also breached the duty of loyalty each of them owed to Seacoast during the term of their employment. They did so by soliciting at least seven (7) of their subordinate employees to leave their employment with Seacoast *en masse* and come work for the Individual Defendants at a direct competitor; and by helping to coordinate and execute this mass resignation in a manner designed to cripple Seacoast's commercial banking operations in the Orlando area.

172.    The Individual Defendants—along with their five top Bankers and two top Banking Coordinators—quit their jobs at Seacoast after business hours on Thursday, December 26, 2019, without any prior notice whatsoever. As a result of this sudden departure, Seacoast lost approximately 50% of its employees in the Central Florida commercial line of business, including *all* of its mid- and upper-level management.

173.    This mass resignation was calculated and coordinated to take place in the middle of the holiday season, making it much more difficult for Seacoast to respond to the sudden departure of Diemer's team. It also provided Diemer and his team with an unfair head start on trying to solicit Seacoast's customers on behalf of One Florida Bank—aided by the confidential and trade secret information that Diemer had accessed without authorization and misappropriated in the preceding days—while Seacoast was still scrambling to make adjustments.

174.    Indeed, on information and belief, some or all of the Individual Defendants and their team members began work at One Florida Bank the very next day, on December 27, 2019, after initially suggesting to Seacoast the night before that they might be willing to sit down and discuss their resignations and then claiming that they were unavailable for any business meetings because of the holidays and other personal plans.

175.    The conduct described above far exceeds the bounds of fair and lawful competition. To the contrary, it evidences a clear intent by the Individual Defendants not only to leave Seacoast to work for a competitor, but to seriously damage Seacoast's ability to compete in the process for the intended gain of One Florida Bank.

176.    With no warning, the Individual Defendants took Seacoast's entire management team and its highest-producing Bankers from the Central Florida commercial line of business—a portfolio of loans in excess of $640 million and significant associated deposits—and immediately began working for a competitor.

177.    Accordingly, the coordination and calculation that necessarily preceded such a move—all done while still employed by Seacoast in managerial positions, and likely in

concert with One Florida Bank—cannot be construed as mere "preparation" for future competition with Seacoast. It was instead an egregious breach of the duty of loyalty that the Individual Defendants owed to Seacoast as its employees.

178.    Through their disloyal acts, the Individual Defendants have proximately caused, and will continue to cause, substantial injury to Seacoast.

179.    The Individual Defendants' breach of their duty of loyalty was willful, wanton, and malicious and in reckless disregard of those duties and the company's rights, as well as of the harm they were causing and were foreseeably likely to cause to Seacoast.

180.    The Individual Defendants are not entitled to the salary and other compensation and benefits they were paid by Seacoast during the period in which they breached their duty of loyalty to the company. Such undeserved earnings should be disgorged and returned to Seacoast, in addition to compensating Seacoast for the additional damages it suffered as a result of the Individual Defendants' disloyalty.

## Count V

## Civil Conspiracy
### (Against All Defendants)

181.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 180 as if fully set forth herein.

182.    On information and belief, the Individual Defendants and One Florida Bank, acting in concert with each other, agreed to take collective actions in breach of the duty of loyalty that the Individual Defendants owed to Seacoast.

183.    In furtherance of their conspiracy and scheme, the Individual Defendants and One Florida Bank, acting in concert with each other, took overt and wrongful acts that breached of the duty of loyalty that the Individual Defendants owed to Seacoast.

184.    The Individual Defendants and One Florida Bank further acted in concert with one another to steal Seacoast's trade secrets, and to unlawfully interfere with the employment relationships that existed between Seacoast and its valuable Commercial line of business employees.

185.    The conspiratorial acts by the Individual Defendants and One Florida Bank were designed to injure Seacoast's business and allow the Individual Defendants and One Florida Bank to unfairly compete against Seacoast.

186.    The above-described conspiracy by the Individual Defendants and One Florida Bank was carried out in willful, wanton, malicious and reckless disregard of Seacoast's rights, as well as of the harm Defendants were causing and were foreseeably likely to cause to Seacoast.

187.    Through their conspiratorial acts, the Individual Defendants and One Florida Bank have proximately caused substantial injury to Seacoast for which Seacoast is entitled to recover damages.

### Count VI

### Unjust Enrichment
**(Against Diemer, DeSousa, Casebier, Wickman and One Florida Bank)**

188.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 187 as if fully set forth herein.

189.    Diemer was provided access to Seacoast's confidential and trade secret information about its customers for the sole purpose of fulfilling his job duties for Seacoast, including but not limited to his unrestricted access to customer information in RPS.

190.    The other Misappropriation Defendants were also entrusted with access to their portfolios in RPS, and the confidential, proprietary and trade secret information they contained, for purposes of performing their job duties and servicing their customers on behalf of Seacoast.

191.    The Misappropriation Defendants intentionally misappropriated trade secrets and confidential information by accessing confidential and trade secret customer information in RPS not for the purpose of fulfilling their job duties for Seacoast, but in order to enable them to directly and/or indirectly solicit Seacoast customers on behalf of One Florida Bank, in violation of Seacoast's Information Security Policy and their contractual promises in their restricted stock award agreements.

192.    It would be inequitable for the Misappropriation Defendants and/or One Florida Bank to retain the benefit of Seacoast's confidential information and trade secrets without compensating Seacoast.

**Count VII**

**Unfair Competition**
**Under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et. seq.***
**(Against Diemer, DeSousa, Casebier, Wickman and One Florida Bank)**

193.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 192 as if fully set forth herein.

194.    Diemer was provided access to Seacoast's confidential and trade secret information about its customers for the sole purpose of fulfilling his job duties for Seacoast, including but not limited to his unrestricted access to customer information in RPS.

195.    The other Misappropriation Defendants were also entrusted with access to their portfolios in RPS, and the confidential, proprietary and trade secret information they contained, for purposes of performing their job duties and servicing their customers on behalf of Seacoast.

196.    The Misappropriation Defendants intentionally misappropriated trade secrets and confidential information by accessing confidential and trade secret customer information in RPS not for the purpose of fulfilling their job duties for Seacoast, but in order to enable them to directly and/or indirectly solicit Seacoast customers on behalf of One Florida Bank, in violation of Seacoast's Information Security Policy and their contractual promises in their restricted stock award agreements.

197.    It would be inequitable for the Misappropriation Defendants and/or One Florida Bank to retain the benefit of Seacoast's confidential information and trade secrets without compensating Seacoast.

## Count VIII

### Tortious Interfere with Business Relations
### (Against All Defendants)

198.    Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 197 as if fully set forth herein.

199.    While still employed as a high-level SVP with Seacoast, Diemer conspired with One Florida Bank to coordinate the mass resignation of himself and 11 other members

of his Seacoast team—constituting all of the Commercial executives in the Central Region and approximately half of its total employees—in order to "lift out" the entire Commercial line of business from Seacoast's Central Region and bring it to One Florida Bank.

200.    The other Individual Defendants, also while employed in managerial positions with Seacoast, similarly conspired to solicit their subordinates to leave their employment with Seacoast and work for a competitor.

201.    The Individual Defendants executed their mass resignations on December 26, 2019, because they knew that doing so during the Christmas week would make it extremely difficult for Seacoast to take quick action to preserve its business.

202.    It is a custom of the trade in the Florida banking business for employees to provide a minimum of two-weeks notice at the time that a resignation is submitted.

203.    None of the Individual Defendants offered any notice of their intent to resign, nor did any of them offer to work a standard two-week notice period to help Seacoast transition their responsibilities to replacement employees.

204.    The fact that the Individual Defendants chose to execute their resignations with no notice, in the middle of the holiday season, gave Seacoast no opportunity to prepare for such a significant loss or otherwise ensure an orderly transition.

205.    The fact that the Individual Defendants did not provide Seacoast with customary advance notice evidences the fact that their resignations were deliberately coordinated to maximize the disruption to Seacoast's Central Florida business and provide One Florida Bank with an unfair advantage in seeking to poach Seacoast's customer base in that Region.

206.    On information and belief, the mass resignations of Diemer and his team were deliberately executed in the above manner in order to cripple Seacoast's Central Florida operations, and to prevent Seacoast from having any opportunity to reach out to the departing Bankers or otherwise effectively respond after learning about the mass resignations.

207.    The manner and timing in which the mass resignations were executed was contrary to industry practice and violated the customary "rules of the game" for the Florida banking industry. In conspiring to execute the mass resignation so as to maximize its harmful effect on Seacoast, the Individual Defendants and One Florida Bank deliberately and wrongfully acted to interfere with Seacoast's business relationships with its employees and customers.

208.    The conduct described above far exceeds the bounds of fair and lawful competition. To the contrary, it evidences a clear intent by the Individual Defendants not only to leave Seacoast to work for a competitor, but to seriously damage Seacoast's ability to compete in the process for the intended gain of One Florida Bank.

209.    Accordingly, the coordination and calculation that necessarily preceded such a move—all done while still employed by Seacoast in managerial positions, and likely in concert with One Florida Bank—cannot be construed as mere "preparation" for future competition with Seacoast. It instead constitutes wrongful, unlawful and tortious interference with Seacoast's business relations.

210.    Through their knowingly tortious interference with Seacoast's business relations, the Individual Defendants and One Florida Bank have proximately caused, and will continue to cause, substantial injury to Seacoast.

211.   Defendants' tortious interference with Seacoast's business relations was willful, wanton, and malicious, and in reckless disregard of Seacoast's rights and the harm that Defendants were causing, and were foreseeably likely to cause, to Seacoast.

212.   Because the Individual Defendants were essentially acting within the scope of their employment as One Florida Bank's agents in coordinating and executing the mass resignations in order to harm Seacoast's business relations and further One Florida Bank's unfair competitive advantage, One Florida Bank is liable for their tortious conduct.

## Count VIII

### Injunctive Relief
### (All Defendants)

213.   Seacoast repeats and realleges each and every allegation set forth in Paragraphs 1 through 212 as if fully set forth herein.

214.   In addition to the damages Seacoast has suffered, the Misappropriation Defendants and, by extension, their new employer One Florida Bank, are in ongoing possession of Seacoast's confidential and trade secret information, including information pertaining to its most valuable customers in the Commercial line of business, which poses a significant threat of continued unauthorized disclosure and use of such information to the detriment of Seacoast.

215.   Seacoast has no adequate remedy at law to compensate it for the Misappropriation Defendants' misappropriation of Seacoast's trade secrets, which include unique and proprietary ranking metrics for all of Seacoast's customers that will enable the the Misappropriation Defendants to target the most valuable of Seacoast's customers on behalf of One Florida Bank.

216. The Misappropriation Defendants' continuing possession and/or use of Seacoast's confidential and trade secret information poses an imminent threat of irreparable injury to Seacoast, for which Seacoast has no adequate remedy at law.

217. Further, whenever the Misappropriation Defendants or a member of their team solicits one of the Seacoast customers whose information the Misappropriation Defendants wrongfully misappropriated, Seacoast is entitled to equitable relief including injunctions.

218. If the Misappropriation Defendants and One Florida Bank are not enjoined by this Court from using the confidential and/or trade secret information that the Misappropriation Defendants unlawfully obtained from RPS to unfairly compete with Seacoast after Defendants conspired to decimate Seacoast's Central Florida commercial line of business overnight, the harm that Seacoast will suffer outweighs any harm that the issuance of an injunction may have upon Defendants.

219. Seacoast has a substantial likelihood of success on the merits of its claims.

220. Seacoast seeks the assistance of the equitable and legal powers of this Court to prevent this irreparable damage from continuing and occurring.

IV.     **PRAYER FOR RELIEF**

WHEREFORE, Seacoast respectfully seeks a judgment in its favor and against Defendants and requests the Court to grant the following relief:

1.     Issue a permanent injunction restraining the Individual Defendants and One Florida Bank, and anyone acting on their behalf or in concert with them, from the following:

    a.     Using, disclosing, or continuing to possess Seacoast's confidential information and/or trade secrets, including any and all reports or information obtained from Seacoast's proprietary Relationship Profitability System ("RPS");

    b.     Contacting or soliciting any Seacoast customer whose confidential information any of the Individual Defendants reviewed and/or obtained a record of via RPS during December 2019 (*i.e.*, in the three weeks prior to their sudden mass resignation from employment with Seacoast to work for a competitor) in an effort to do business with that customer; and

    c.     Contacting or soliciting more Seacoast employees in an effort to hire them away from Seacoast using Seacoast confidential information and/or trade secrets.

2.     Require the Individual Defendants and One Florida Bank to account to Seacoast for and disgorge all profits derived from the misappropriation of Seacoast's customer information by Diemer, DeSousa, Casebier and Wickman, and/or any of their team members acting on their behalf;

3.     Award damages to Seacoast, including but not limited to actual damages and compensatory damages;

4.     Award Seacoast its attorneys' fees and costs; and

5.     Award any such other and further relief as may be deemed just and proper.

Respectfully submitted this 10th day of January, 2020.

**BISHOP & MILLS**

By: /s/ *Thomas E. Bishop*
      Thomas E. Bishop

Florida Bar Number 956236
One Independent Drive, Suite 1700
Jacksonville, Florida 32202
(904) 598-0034/(904) 598-0395 (fax)
*tbishop@bishopmils.com*

**ALSTON & BIRD LLP**

By: /s/ *Christopher C. Marquardt*
      Christopher C. Marquardt

Florida Bar No. 0102466
Georgia Bar No. 471150
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
chris.marquardt@alston.com
*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SEACOAST BANKING CORPORATION OF  )
FLORIDA, and SEACOAST NATIONAL  )
BANK  )
  )  CIVIL ACTION FILE
       Plaintiffs,  )  NO.
  )
v.  )
  )
MATTHEW DIEMER, JOSEPH DESOUSA,  )
JOHN CASEBIER, BRIAN WICKMAN, and  )
GARRY LITTLER, as individuals, and  )
ONE FLORIDA BANK, a Florida  )
Corporation,  )
  )
       Defendant.  )

_____

## **VERIFICATION**

My name is Charles Shaffer and, pursuant to 28 U.S.C. § 1746, I hereby affirm that I am over 18 years of age and am competent to make the following Verification:

    (1)     I am currently employed as Executive Vice President, Chief Operating Officer and Chief Financial Officer at Seacoast Bank;

    (2)     I have read the foregoing Verified Complaint for Injunctive Relief and Damages and hereby verify that the allegations of fact contained therein are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

## [SIGNATURE ON FOLLOWING PAGE]

Executed this 10th day of January 2020.

_____

CHARLES SHAFFER